UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DAVID CANANIA AND CHERYL CANANIA,

        Plaintiffs,

    v.

STEVEN K. DIPPOLD AND DIPPOLD
TRUCKING, a corporation,

        Defendants.

Case No. 3:22-cv-02421-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on several motions: a motion to quash, filed by non-party Olive Surgical Group, Ltd., on May 9, 2024, (Doc. 48); a motion for entry of a protective order, filed by non-party Olive Surgical Group, Ltd., on July 12, 2024, (Doc. 64); and a motion to compel a rule 35 examination, filed by the Defendants on July 25, 2024. (Doc. 69).

Being duly advised in the premises having fully considered the issues and arguments raised, the Court **GRANTS in part** and **DENIES in part** the motion to quash, (Doc. 48), **GRANTS** the motion for a protective order, (Doc. 64), **EXTENDS** the time for Olive Surgical to produce those documents by **thirty days from the entry of this order**, and **GRANTS** the motion for a rule 35 examination. (Doc. 69).

## I.   MOTION TO QUASH

Non-party Olive Surgical Group, Ltd., sought to quash a subpoena served on them by the Plaintiffs, seeking eight years of financial information from Dr. Robert Bernardi. Olive Surgical Group objected to the production of that information and argued that four years of financial information was sufficient, citing Fed. R. Civ. Pro. 26. After calling a hearing on the matter, the Court determined that four years was appropriate and indicated that a written order would

1

follow. Shortly thereafter, the Plaintiffs submitted a proposed order to chambers. However, the Plaintiffs neglected to mention that Olive Surgical Group either had not consented, or had outright objected, to the proposed order submitted. Olive Surgical Group submitted their own proposed order indicating their opposition to the Plaintiffs' proposed order.

Despite the Court's clear and unambiguous ruling that *four and only four* years of financial records would be subpoenaed, both orders included alternative interpretations of "four years."  The Plaintiffs believed that *calendar* years were appropriate and, because 2024 is not yet a full calendar year, that they were entitled to four *full* calendar years of financial records for 2020–23, in addition to the financial records for 2024—fifty-five months in total. Olive Surgical, on the other hand, agreed that calendar years were appropriate, but argued that 2024—even if incomplete—was still a calendar year. Consequently, Olive Surgical requested that they only be required to produce financial records for 2021–24—forty-three months in total.

As the parties were unable to agree on the definition of "four years," the Court clarified during the hearing that "four years" meant forty-eight months. The motion to quash was therefore granted in part and denied in part—Olive Surgical Group would still be required to produce financial documents, but only for four years (forty-eight months) not eight years as the Plaintiffs had originally asked for, nor for any of the alternative intervals proposed.

## II.    <u>MOTION FOR PROTECTIVE ORDER</u>

Given the Court denied the motion to quash only in part, Olive Surgical Group was required to hand over financial documents for the passed four years. Those documents included Dr. Bernardi's tax documents, among other financial papers. Notably, the Court already entered a protective order between the Plaintiffs and Defendants, but that protective order did not include third parties and non-parties such as Olive Surgical.

The Plaintiffs objected to the protective order citing case law disfavoring some protective orders; however, the case law that the Plaintiffs cite concern *blanket* protective orders and often over materials that are directly linked to the litigation or controversy. That is not the situation here. Dr. Bernardi seeks to protect his *specific* and *personal* financial records from public disclosure and that information is only being sought to evaluate Dr. Bernardi's bias—it is not relevant for evaluating the underlying claims involved.

The Plaintiffs quote the Illinois Supreme Court declaring that "the right of access to court records is essential to the proper functioning of democracy." *Skolnick v. Alzheimer & Gray*, 191 Ill.2d 214, 230 (2000). While judicial transparency is a bedrock principle of the American justice system, it is doubtful that protecting four years of Dr. Bernardi's financial documents from public dissemination will be the fatal blow that causes the pillars of American democracy to collapse.

Generally, "pretrial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings." *American Tel. & Tel. Co. v. Grady*, 594 F.2d 594, 596 (7th Cir. 1978). Though that is true, and there is a strong presumption in favor of the common law right to access, like all rights, "[t]his right . . . is not absolute. The presumption of access . . . can be rebutted if countervailing interests heavily outweigh the public interests in access." *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007) (internal quotations omitted). The public interest "does not always trump the property and privacy interests of the litigants, but it can be overridden only if . . . there is good cause for sealing a part or the whole of the record in that case." *Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999). Importantly, that "strong presumption of public disclosure applies *only* to the materials that formed the basis of the parties' dispute and the district court's resolution." *Baxter Int'l, Inc. v.*

3

*Abbott Labs.*, 297 F.3d 544, 548 (7th Cir. 2002) (emphasis added).

The Plaintiffs argue that the public interest here supersedes Olive Surgical Group's "desire for secrecy." The Plaintiffs overstate their case. Seeking to protect one's financial documents, contracts, and medical work from public disclosure is hardly an effort to shroud this litigation in secrecy. Olive Surgical seeks protection from public disclosure for only a select number of Dr. Bernardi's financial documents. Privacy is not secrecy. As any financial investigator will attest, many details about someone's life can be constructed from bank statements and financial information; it is perfectly reasonable to want to protect that information from wide, perpetual dissemination, in the internet age. The information is highly sensitive, is highly intrusive, stretches over four years, and the nature of the internet means that it will be eternally preserved and easily accessible for any internet user in a matter of seconds. All these factors support a finding that good cause exists to enter a protective order.

Furthermore, the Plaintiffs are requesting Dr. Bernardi's financial documents to gather impeachment evidence for his expert testimony. It is unlikely that Dr. Bernardi's financial documents would be a core issue in this case. If this case were about Dr. Bernardi and those documents, the analysis would be different, but as it stands, it is doubtful these documents would even appear in a filing, let alone form the basis of this Court's resolution. As *Baxter Int'l v. Abbott Labs* indicates, that fact cuts against the presumption of public access.

When the Court pressed Plaintiffs' counsel on their reasons for opposing the protective order, Plaintiffs' counsel gave two: (1) that it would be burdensome for their office to dispose of the records after the litigation concludes and (2) that they wished to retain Dr. Bernardi's financial information on file to save time and resources in the event that Dr. Bernardi is an adversarial expert witness in a future case where Plaintiffs' counsel is involved.

4

Neither is convincing.

Beginning with the claim that it would be overly burdensome, the Court is skeptical that disposing of Dr. Bernardi's financial documents would be overly burdensome. In the modern era, most discovery is electronic and even the most luddite litigators have organizational systems that allow documents to be placed where they can be easily retrieved and disposed of. Plaintiffs' counsel's argument would be more persuasive if this burden was placed solely on Dr. Bernardi's documents alone, but, as Olive Surgical Group pointed out in their memorandum, there is already a protective order in place between the parties—meaning Plaintiffs' counsel's office will *already* be required to sort through and dispose of sensitive information after this litigation has ended; it should not be difficult to include Dr. Bernardi's files in that list. Surely if Plaintiffs' counsel can keep the parties' protected documents secure, they have the capacity and resources to keep a nonparty's protected documents secure; the same is true for their disposal.

Additionally, it seems contradictory for Plaintiffs' counsel to argue that properly disposing of Dr. Bernardi's documents after this case has concluded would be too burdensome, but then turn around and argue that retention of Dr. Bernardi's financial documents would be of some great value to Plaintiffs' counsel in future litigation. If Plaintiffs' counsel has the capability to organize and store Dr. Bernardi's financial information in a manner that can be easily recalled and referenced at any point in the future, that detracts from Plaintiffs' counsel's claim that they would be extraordinarily burdened by securing and destroying that same information.

Turning to the claim that retaining Dr. Bernardi's documents would save time and resources in future litigation—that is doubtful. Even if the Court were to indulge Plaintiffs' counsel and allow them to keep Dr. Bernardi's financial documents for future use, the Court suspects that, in practice, this would not actually save time or resources. Plaintiffs' counsel has

adamantly insisted on obtaining and retaining eight years of Dr. Bernardi's financial information—so much so that it was necessary to hold not one, but two hearings on the matter. If Plaintiffs' counsel finds it objectionable to not have access to *eight years* of passed financial information and cannot compromise on whether an additional six months of information should or should not be handed over, it is abundantly clear that Plaintiffs' counsel places great emphasis on these documents. Without passing judgment on whether the value gained is commensurate with the time and resources that have been expended, if Plaintiffs' counsel places such a high value on having a complete financial picture of Dr. Bernardi, it is logical to presume, were Plaintiffs' counsel to encounter Dr. Bernardi in future litigation—whether three months or three years from now—that Plaintiffs' counsel will demand Dr. Bernardi's *most recent* financial documents. Thus, regardless of how the Court rules here, Plaintiffs' counsel would be making the same demands to a future court, defeating the argument that granting their request would save time and resources.

If Plaintiffs' counsel does not wish to retain Dr. Bernardi's documents to save time and resources in the future, and Plaintiffs' counsel are perfectly capable of disposing of those documents, there is an open question as to why precisely Plaintiffs' counsel are so insistent on obtaining and retaining this information. The Court is aware that some law offices retain expert information to sell or pass on to other interested parties in the future. If that is the reason for opposing Olive Surgical's motion for a protective order, the Court strongly disapproves and finds such reasoning to be an insufficient basis for opposing a protective order. Not only does that motive pervert the purpose of discovery, it also places the pecuniary gain of the attorneys above that of their clients—who are paying their attorneys to request, review, and litigate over these documents when it has little to no benefit for them. While that has not been alleged here, when

6

the Court voiced its disapproval of trading information, Plaintiffs' counsel did not object nor deny that was their motive.

When an expert witness agrees to provide their opinion, they are subject to scrutiny and discovery, but that discovery must be reasonable. The Plaintiffs initially requested eight years of financial information from Dr. Bernardi. At the previous hearing, the Court asked what greater benefit would be gained by reviewing an additional four years of financial documents. The Plaintiffs had no satisfying answer. The initial overbroadness of the discovery request, the fact that Bernardi's financial documents are unlikely to be a core issue in this case—let alone be filed—and the Plaintiffs lack of a satisfying answer, begins to paint an unsavory picture: that the Plaintiffs' requests may have less to do with gathering financial information for a legitimate purpose and more to do with some kind of ulterior motive. If that is the case, then Fed. R. Civ. Pro. 26(c)'s standard for issuing a protective order is more than satisfied.

If litigants in future cases where Plaintiffs' counsel are involved knew that any expert they sought to hire, by agreeing to be an expert witness against Plaintiffs' counsel's client, would entirely forfeit their right to privacy and have nearly a decade of their personal financial records easily, indefinitely accessible on the internet; it would have an extraordinary chilling effect. Courts are not omniscient; our judicial system relies on expert witnesses in many areas. Imposing a chilling effect of the magnitude the Plaintiffs request would discourage experts from sharing knowledge that may be vital to deciding cases. Thus, public policy weighs in favor of granting the protective order.

The Plaintiffs' brief stakes out the position that by volunteering to be an expert witness, one entirely forfeits their right to privacy:

> Significantly, Dr. Bernardi and Olive Surgical Group, Ltd. are controlled expert witnesses who *voluntarily inserted themselves* into this litigation. As a result,

7

this information has *no* reasonable expectation of privacy and Olive Surgical Group's Motion should be denied.

(Doc. 68) (emphasis added). The Court disagrees. Expert witnesses do not forfeit their rights at the courtroom door. Setting aside public policy concerns, there are times when legitimate concerns for the interests of justice and judicial transparency require the disclosure of even sensitive information to the public eye—but that is not the situation here. The Plaintiffs' lack of any satisfying explanation for seeking and retaining this information is troubling.

In summary, examining Plaintiffs' counsel's reasoning for opposing this protective order makes little sense. The public is unlikely to even see these documents, any value Dr. Bernardi's financial documents would have in future litigation involving him would be minimal to nonexistent, Plaintiffs' counsel are more than capable of disposing of these documents after litigation has ended, and it seems that the only reasons for opposing the protective order are inappropriate—either to chill, harass, deter, or embarrass Dr. Bernardi and other witnesses; or alternatively to trade in Dr. Bernardi's information. Regardless of how the Court rules, Plaintiffs' counsel's persistence and insistence that they be given as much information as possible and be allowed to retain these documents after litigation—despite its minimal benefit—does not aid in the perception that Plaintiffs' demands are being driven by some ulterior motive. For all these reasons, Olive Surgical has met their burden and shown that there are more than sufficient grounds for concluding that good cause exists under Fed. R. Civ. P. 26(c) to prevent public disclosure of Dr. Bernardi's financial documents. Accordingly, the Court grants Olive Surgical's request for a protective order.

Given the Court ordered Olive Surgical to disclose those documents within thirty days and this order comes shortly before that deadline, the Court extends the time for the Defense to disclose the disputed documents to thirty days after the entry of this order.

### III.    **PROTECTIVE ORDER**

The Court hereby enters the order as follows:

1.         **Purpose of Order**.  During the course of this litigation, confidential documents may be produced and the Parties may seek the discovery of certain proprietary and confidential information and material from each other, as well as from third-parties and non-parties, such as Olive Surgical Group, LTD and Dr. Robert Bernardi.  The Parties may also choose to use certain proprietary and confidential information in support of pleadings, at hearings, during depositions and at trial.  The purpose of this Order is to prevent disclosure of matters deemed confidential under the terms of this Order to persons or entities other than those involved in the prosecution or defense of this litigation and to facilitate the exchange of information between the Parties and that derived from subpoenas.

2.         **Confidential Material.**  Certain documents and information produced in this litigation may be considered confidential if:  (a) the producing or receiving party considers the document or information to be proprietary, sensitive and it is of such nature that it is not generally known or capable of independent discernment; (b) the document or information relates to a third- party or employee about which the third-party or employee would have a reasonable expectation of privacy;  (c) the producing or receiving party reasonably believes the document or information to be of such a nature that the use of such document or information by the other parties (whether parties to this action or otherwise) outside this litigation would give such party an unfair competitive advantage in the marketplace ("Confidential Material") or (d) the information or documents represent non-public information which either of the Parties would consider to be confidential and proprietary and is only being made available because of compliance of a subpoena third parties or non-parties.

3.      **Designating Documents and Information as Confidential.** All parties producing or receiving Confidential Material should identify the material as such by marking each page of the document, or all confidential portions thereof, with a designation of "CONFIDENTIAL" or "SUBJECT TO PROTECTIVE ORDER" or as appropriate. The Parties agree that either may designate documents or information provided by a third party and/or a non-party as "CONFIDENTIAL" or "SUBJECT TO PROTECTIVE ORDER" or as appropriate. The inadvertent failure to designate material as "CONFIDENTIAL" or "SUBJECT TO PROTECTIVE ORDER" does not preclude a party from subsequently making such a designation, and, in that case, the material is treated as confidential only after being properly designated.

a.      Plaintiff, Defendant or third-parties may designate as "Confidential" or documents, specific written discovery responses (including responses to interrogatories, document requests, subpoenas, and request for admissions), or testimony by labeling the specific document, response or transcript pages as "Confidential" as appropriate.

b.      In the event any Confidential Material is used in any Court proceeding herein, including at depositions, they shall not lose their confidential status through such use, and the parties shall take all steps reasonably required to protect the confidentiality of such documents, testimony, information or other materials designated as "Confidential" during such use.

4.      **Designating Deposition Testimony as Confidential.** Plaintiff, Defendant, or third-parties may designate deposition testimony, or any portion thereof, as "Confidential" by advising the court reporter and other counsel of such designation during the course of the deposition or within fifteen (15) days following receipt of the deposition transcript.

5.    **Limited Disclosure of Confidential Material.** Confidential Material is not to be used for any purpose other than the prosecution and defense of this litigation.  To that end, no Confidential Material produced by the Parties, Third Parties or Non-Parties may be revealed to any person other than: (a) the parties; (b) the attorneys of record for the parties; (c) support staff of such attorneys; (d) the parties' officers or employees who are directly involved in the prosecution and defense of this litigation; (e) any expert witness whom the parties engage, designate or consult; (f) persons who authored the document; (g) the Court; (h) the Court's staff; (i) court reporters employed for purposes of recording deposition testimony; and (j) any person whose testimony is taken, or is to be taken, in this litigation, except that such a person may only be shown the Confidential Material during his or her testimony and in preparation therefore, and only to the extent necessary for the preparation or taking of such testimony (collectively, "Qualified Persons").

a.    Each Qualified Person to whom Confidential Material is disclosed pursuant to this Protective Order or who hears testimony concerning the Confidential Material shall be advised that such information is being disclosed pursuant to, and subject to, the terms of a Protective Order of the Court and that the sanctions for any violations of the Protective Order include penalties which may be imposed by the Court for contempt.

b.    Except for use by Qualified Persons, no document or other written material which contains or makes reference to Confidential Material may be photocopied, transcribed electronically, or otherwise reproduced, summarized or digested in any manner without the prior written approval of the party producing said document. The person, corporation, partnership, association, trust or entity seeking such approval shall specify the reasons and circumstances underlying such request and shall certify that only those authorized to receive

Confidential Material under the terms of the Protective Order will receive Confidential Material as a result of such copying or reproduction. For the purpose of this Protective Order, transmission by facsimile and/or email is deemed to be copying or reproduction.

6. **Maintaining Confidentiality.** All Qualified Persons shall keep all Confidential Material in a reasonably secure fashion, and shall take reasonable steps in accordance with usual business practices necessary to limit access to such materials and any copies thereof.

7. **Agreement to Abide by Protective Order.** Each Qualified Person, except for the Parties (including the Parties' officers or employees), the attorneys of the Parties, the attorney's staff, the Court and the Court's staff, and any court reporter, and persons who authored or the Confidential Material, shall be required to sign a "Confidentiality Agreement," attached hereto, if the Confidential Material is to be disclosed to such Qualified Person. The original copy of each executed Confidentiality Agreement shall be maintained by the attorney revealing the Confidential Material to such Qualified Person. Further, any attorney in possession of an executed Confidentiality Agreement shall forward each executed Confidentiality Agreement in his or her possession to opposing counsel within ten (10) days following a written request for same, or as ordered by the Court.

8. **Use of Confidential Information**. Except as may be otherwise required by local rules of the Court, Confidential Material used in connection with any pleading, brief, motion, hearing, or at trial in this action shall be filed under seal or submitted to the Court for in camera inspection or as the parties may agree or the Court directs. In the event that counsel for any party in this case determines to file with, or submit to, the Court any Confidential Material under seal, such information shall be filed as required by the Court or Local Rules. All

such materials so filed shall be maintained by the Clerk of the Court separate from the public record in this action and shall be released only upon further order of the Court.

9.      **Disputes Concerning Designation(s) of Confidential Material**. Nothing contained in this Protective Order is meant to prohibit a party from challenging the confidential designation of a document through appropriate motion with the Court.  A party objecting to the designation of Confidential Material may, after making a good faith effort to resolve any such objection, move on reasonable notice for an order vacating the designation.  If such a motion is filed, the designating party shall bear the burden of demonstrating the proprietary of the designation.  While such application is pending, the material in question shall be treated as Confidential Material pursuant to the Protective Order.

10.      **Return and/or Destruction of Confidential Material.**  After final termination of all pending litigation relating to the above-captioned cause, whether by settlement or otherwise, each party and its counsel in possession of any Confidential Material shall destroy the documents or, if not already destroyed, return to opposing counsel all Confidential Materials within thirty (30) days following a request made in writing; or as ordered by the Court.  All notes, memoranda, summaries or other documents referring, describing, or relating to the documents, testimony, information or other materials designated as "Confidential" shall be destroyed.

IV.     __MOTION TO STRIKE OR COMPEL RULE 35 EXAMINATION__

        As the Court had not published a written order after the hearing concerning the Motion to

Strike, (Doc. 50), and the Motion to Compel Rule 35 Examination, (Doc. 69), is substantially

related to the Motion to Strike, the Court shall address both matters here.

        On December 18, 2023, the Court granted a motion to amend the scheduling order. (Doc.

43). In the joint proposed scheduling order, it was stated that the Plaintiffs have already disclosed

their experts. By agreement of the parties, Plaintiffs' deadline to disclose experts was February

15, 2024. *Seventy-seven* days after the deadline to disclose had passed, the Plaintiffs disclosed

that they had retained Tim Kaver to conduct a vocational assessment of Mr. Canania.

        The Defendants moved to strike Kaver. (Doc. 50). The Defendants pointed to Fed. R's

Civ. Pro. 37(c)(1), 26(a)(2), and 26(e); arguing that "when a party fails to identify a witness as

required . . . the party is not allowed to use that witness to supply evidence . . . unless the failure

was substantially justified or is harmless." (Doc. 50). The Defendants also noted that "[t]he

Seventh Circuit has stated that 'the sanction of exclusion is automatic and mandatory unless the

sanction party can show that its violation . . . was either justified or harmless.'" (Doc. 50)

(quoting *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)).

        The Plaintiffs responded to the Defendants motion stating that the Defendants had not

reached out to the Plaintiffs prior to filing their motion to strike with the Court and argued that,

because Mr. Canania was on post-surgical restriction until April of this year, he "could not be

evaluated by a vocational specialist until he had been placed at maximum medical improvement

and given permanent restrictions by his surgeon." (Doc. 54). The Plaintiffs presented evidence

that they forwarded Kaver's report to the Defendants the day after they received it. The Plaintiffs

also offered Kaver for a deposition and stated that the Defendants were welcome to find a

14

rebuttal witness.

While it was questionable why the Plaintiffs waited to disclose and agreed to an earlier disclosure date when they wanted a vocational assessment, there was no indication that the Plaintiffs acted in bad faith or willfully chose not to disclose. Mr. Canania could not be accurately assessed until his condition had fully stabilized and the Plaintiffs had provided Kaver's report to the Defendants almost immediately. Additionally, the Plaintiffs offered Kaver for a deposition and welcomed the Defendants to retain a rebuttal witness. The disclosure did come seventy-seven days after the deadline had passed, but the discovery deadline had not expired and the Defendants had until September to disclose their own expert witnesses. Though unquestionably late, the Court concluded that allowing Kaver would not be prejudicial nor would it constitute surprise nor was it likely to disrupt the trial. For all these reasons, the Court denied the Defendants' motion to strike.

Following the Court's oral order denying the Defendants' motion to strike, the Defendants hired their own vocational expert, Jason Purinton. The Defendants wanted Purinton to evaluate Mr. Canania's condition and conduct his own vocational assessment. The Plaintiffs refused. While the Plaintiffs were willing to allow Purinton as a rebuttal witness, make Kaver available for deposition, and provide the Defendants with the information Kaver had gathered; the Defendants still wished to conduct their own evaluation.

Rule 35(a) provides for physical or psychological examination by a licensed or certified professional. Fed. R. Civ. P. 35(a). In the past, Rule 35(a) only allowed licensed physicians and psychologists to conduct physical or psychological examinations. However, Rule 35 was amended to expand the scope of professionals who could conduct said evaluations. The standard for a Rule 35 examination is higher than relevance; there must be good cause for the examination

to avoid litigants being subject to "needlessly duplicative, cumulative, and invasive" examinations. *In re Cook Med. Inc*., 2017 U.S. Dist. LEXIS 83575, *6 (S.D. Ind. June 1, 2017). To satisfy the good cause standard, a movant must show "that each condition as to which the examination is sought is really and genuinely in controversy." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964). While having the ability to obtain the information from alternative means is relevant, *Id*., it is not dispositive.

The Plaintiffs opposed Purinton conducting his own evaluation. They argued that Rule 35 does not cover purely vocational assessments; but, even if it did, that Purinton was not suitably credentialed. Additionally, the Plaintiffs argued that the Defendants had failed to show good cause because the information that would be obtained by a Rule 35 examination could be obtained from what the Plaintiffs had already provided or were willing to provide.

The Plaintiffs' arguments are unconvincing.

First, vocational examinations are not verboten under Rule 35. The examination that the Defendants propose would involve evaluating Mr. Canania's *physical and psychological* condition. The fact that this examination is meant to assess his vocational abilities does not change the fact that the examination itself is physical and psychological in nature. The Court heard evidence and concluded that Purinton was suitably credentialed. Therefore, by the plain text of Rule 35, Purinton, as a credentialed professional, may perform a Rule 35 examination.

Second, while the bar for Rule 35 examinations is higher than relevance to avoid unnecessary, duplicative, and invasive examinations; that is not a danger here. The cases that Plaintiffs cite to are either distinguishable in their invasiveness or come from district courts in other circuits. Purinton's examination will largely involve filling out forms and ostensibly involve some physical activity—none of which are invasive. The Defendants are not demanding

16

Mr. Canania subject himself to long medical procedures or something similar—the Defendants merely ask for five hours to fill out forms and demonstrate physical ability. The examination the Defendants have proposed is leagues away from the kinds of unreasonable examinations that the Plaintiffs have cited in their brief.

Third, the Plaintiffs argue that the information they have provided to the Defendants are sufficient to preclude a Rule 35 examination, and, therefore, it would be unnecessarily duplicative. Again, while alternative means to obtain the information is relevant to the analysis, it is not dispositive. Purinton's forms and tests are not owned by him, they are protected intellectual property of a third party; because of their restricted use, it is likely that Purinton's exam will cover more ground than Kaver's or have more nuance—making the information the Plaintiffs would otherwise provide insufficient.

Furthermore, because neither Kaver nor Purinton are doctors, the nature of their examinations and conclusions may vary wildly. Though both experts are credentialed, the Court doubts that their respective fields have the same or similar standardized, uniform, and well-developed diagnostic practices as the fields of medicine and psychology. However, even if the Plaintiffs provided Purinton with enough data to artificially construct an assessment, there are still two major issues: that data has been gathered and filtered through the lens of the Plaintiffs' expert—meaning Puritnon's assessment is based entirely on the efficacy of Kaver's assessment—and it also opens Purinton and his assessment to impeachment because he did not gather the information first-hand.

The Plaintiffs are correct that Rule 35 examinations have a strict good cause standard, but Mr. Canania's condition is not merely relevant; his condition is a *core* and *central* issue in this case. As the Supreme Court has stated, a Rule 35 examination is entirely appropriate when the

17

examination goes to questions that are "really and genuinely in controversy," provided there is good cause for the examination. *Schlagenhauf v. Holder*, 379 U.S. at 118.

The Plaintiffs have claimed, as supported by Kaver's report, that Mr. Canania's physical condition following the collision prevents him from returning to work. No doubt, his alleged inability to return to his chosen profession, the financial burden placed on changing professions, and the cost differential between a new profession and his original one will be crucial in evaluating damages stemming from the collision beyond the costs of property damage and medical treatment. When a key issue in this case is whether one of the Plaintiffs can return to work, it is difficult to think of a reason why his ability to return to work would *not* be really and genuinely in controversy—the exact kind of controversy that a Rule 35 examination would be appropriate for. Given Mr. Canania's condition is a core and central issue in this case, one that is really and genuinely at controversy and the examination the Defendants propose would not be invasive, there is good cause to order the Rule 35 examination.

Previously, the Court denied the Defendants' motion to strike Kaver after the Plaintiffs retained him, *seventy-seven* days *after* the deadline to disclose had expired. In their response to that motion, the Plaintiffs stated the Defendants would not be prejudiced by allowing them to retain Kaver and they welcomed the Defendants to retain a rebuttal witness. While the Court found that allowing Kaver would not be prejudicial, refusing the Defendants request for independent information, providing the Defendants only with information that has come from an adversarial examination, and opening up their rebuttal witness to impeachment *would* be prejudicial. Doing so would provide the Plaintiffs with a windfall as a result of their late disclosure, tipping the scales in the Plaintiffs' favor. The Plaintiffs sought leave to retain an untimely witness, now they must accept the reasonable consequences of that decision—they

must take the bitter with the sweet.

The Plaintiffs have argued that, should the Court grant the motion to compel the Rule 35 examination—which it has—that the Court should require that examination be recorded and that a third party, someone from the Plaintiffs' legal team, should be present at the examination. When the Court inquired why the Defendants' examination should be recorded when the Plaintiffs' examination had not been, the Plaintiffs replied that the Defendants examination is "adversarial," and, therefore, the presence of either a third party or a videocamera was necessary.

This argument is unpersuasive.

The United States has an adversarial system—almost everything in a lawsuit is inherently adversarial. The playing field should be equal between the parties, moreover, placing a third party in the room for the examination would have the unintended effect of making that party a witness. For these reasons, the Court denies the request to have a third-party present and denies the request to videotape the examination. The Court has instructed the parties to convene and come to an agreement on all other matters related to the examination.

## V.    REMINDER TO LITIGATE IN GOOD FAITH

It is clear to the Court through the multiple disputes involved in this case that there is a palpable friction between Plaintiffs' counsel and counsel for the other parties. Given the adversarial nature of a lawsuit, some friction is expected; each attorney has a duty to advocate for the best interests of their client. However, when relations between counsellors deteriorate into acrimony, they must be cautious to avoid crossing the thin line separating zealous advocacy from obstructionism. When counsellors refuse to compromise, when their knee-jerk reaction is to deny all requests from opposing counsel, and when unwillingness to see reason on even the minute details requires the Court's fastidious attention; everyone loses—the attorneys, the legal

profession, the Court, and critically, their clients.

While there is no clear indication that any of the attorneys involved here have crossed over into obstructionism, the Court reminds counsellors of their ongoing duty as members of the legal profession to litigate in good faith and avoid the temptation to descend into obstructionism.

At the end of the last hearing, the Court tasked the parties with reaching an agreement over the details around the Rule 35 examination. The Court trusts, having provided this reminder, that the skilled counsellors here will be able to use their best professional judgment in determining which disputes are important enough to warrant the Court's attention and which disputes can be settled between them without judicial intervention. The Court will always be available to settle any and all disputes that arise, however, counsellors should be mindful that unnecessarily involving the Court serves only to create costly delays that are not only a waste of judicial resources but also cause their respective clients to incur unnecessary expense.

## VI.    <u>CONCLUSION</u>

Being duly advised in the premises having fully considered the issues and arguments raised, the Court **GRANTS in part** and **DENIES in part** the motion to quash, (Doc. 48), **GRANTS** the motion for a protective order, (Doc. 64), **EXTENDS** the time for Olive Surgical to produce those documents by **thirty days from the entry of this order**, and **GRANTS** the motion for a rule 35 examination. (Doc. 69). Furthermore, attorneys for all involved are reminded of their ongoing ethical obligation to avoid obstructionism and to litigate in good faith.

**IT IS SO ORDERED.**
**DATED:  August 28, 2024**

*s/ J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**

20